1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*MORRIS LAW GROUP*
*900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101*
*702/474-9400 · FAX 702/474-9422*

MORRIS LAW GROUP
Robert McCoy, No. 9121
Email: rrm@morrislawgroup.com
Joni A. Jamison, No. 11614
Email: jaj@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada  89101
Telephone:  (702) 474-9400
Facsimile: (702) 474-9422

LEE, HONG, DEGERMAN, KANG & WAIMEY
Eric D. Olson (*pro hac vice to be submitted*)
Email: eolson@lhlaw.com
Keith H. Fichtelman (*pro hac vice to be submitted*)
Email: kfichtelman@lhlaw.com
1920 Main Street, Suite 900
Irvine, California  92614
Telephone: (949) 250-9954
Facsimile: (949) 250-9957

Attorneys for Plaintiff Federal Deposit
Insurance Corporation as Receiver for
Sun West Bank

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER
FOR SUN WEST BANK,

        Plaintiff,

      v.

JACQUELINE DELANEY; LARRY
CARTER; MARK STOUT;
KENNETH TEMPLETON; JOHN
SHIVELY; STEVEN KALB;
JEROME SNYDER; HUGH
TEMPLETON; and RICK
DRESCHLER,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.

**COMPLAINT**

**JURY DEMAND**

The Federal Deposit Insurance Corporation as Receiver for Sun West Bank ("FDIC-R") complains and alleges as follows:

## I. INTRODUCTION

1.    FDIC-R is Receiver for Sun West Bank ("SWB" or the "Bank").  Defendants are nine former officers and/or directors of SWB who each approved certain high-risk loans in violation of the Bank's existing loan policies and prudent lending guidelines.  By this action, FDIC-R seeks to recover damages in excess of $8 million dollars caused by the Defendants' gross negligence and breaches of fiduciary duties.

2.    In a failed attempt to grow the Bank to over $1 billion in assets, the Defendants established a pattern of ignoring regulatory advice, breaching the Bank's own internal lending policies, and violating prudent lending practices by engaging in risky and speculative commercial real estate lending.

3.    The Defendants' acts and omissions violated loan policies and prudent, safe, and sound lending practices, including, among other things, recommending or approving speculative commercial real estate lending transactions despite known adverse economic conditions in the Nevada real estate market; recommending or approving credit to borrowers who were not creditworthy or were known to be in financial difficulty; recommending or approving credit based on inadequate information about the financial condition of prospective borrowers and guarantors and without adequately analyzing borrower and guarantor global cash flows and other critical financial information to determine whether they could service the debt; recommending or approving loans with excessive loan-to-value ratios; and recommending or approving loans deemed "undesirable" per the Bank's loan policies.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

4.      As a result of the Defendants' acts or omissions, they are liable for the damages caused by their gross negligence and breaches of their fiduciary duties.  In this lawsuit, FDIC-R does not seek to collect upon outstanding loans, but rather seeks to collect damages flowing from Defendants' gross negligence and breaches of fiduciary duties, which include, among other things, lost operating capital, lost profits, and lost investment opportunities.

## II.     THE PARTIES

### A.      The Plaintiff

5.      The Federal Deposit Insurance Corporation ("FDIC") is an instrumentality of the United States of America, established under the Federal Deposit Insurance Act, Title 12 of the United States Code section 1811-1831aa, with its principal place of business in Washington, DC.  12 U.S.C. §§ 1811(a), 1813(z).  Among other duties, the FDIC, as receiver, is charged with the orderly liquidation of failed banks.  12 U.S.C. § 1821(c)(2)(A)(ii).

6.      On May 28, 2010, the Bank was closed by the Nevada Department of Business and Industry, Financial Institutions Division ("NDBI"), and FDIC-R was appointed as receiver.  At the time, the Bank was wholly owned by Sun West Capital Corporation ("Bancorp"), a single-bank holding company, which has not filed for bankruptcy protection.  As of May 28, 2010, FDIC-R succeeded to all rights, titles, and privileges of the Bank and its depositors, account holders, and stockholders.  12 U.S.C. § 1821 (d)(2)(A)(i).

### B.      The Defendants

7.      Jacqueline Delaney ("Delaney") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. She also served as President and Chief Executive Officer of the Bank

MORRIS LAW GROUP  ·  900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101  ·  702/474-9400 · FAX 702/474-9422

during this time. Delaney served on the Bank's Management Loan Committee. At the time of the Bank's closing, Delaney had an approximate 4.2% ownership interest in Bancorp.

8. Larry Carter ("Carter") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. At the time of the Bank's closing, Carter had an approximate 15.6% ownership interest in Bancorp.

9. Mark Stout ("Stout") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. At the time of the Bank's closing, Stout had an approximate 4.7% ownership interest in Bancorp.

10. Kenneth Templeton ("K. Templeton") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. He also served as the Bank's Chairman of the Board of Directors during that time. At the time of the Bank's closing, K. Templeton had an approximate 24.3% ownership interest in Bancorp.

11. John Shively ("Shively") joined the Bank in 1999 and served as the Executive Vice-President overseeing Northern Nevada Operations until the Bank closed. Shively also served on the Bank's Management Loan Committee. At the time of the Bank's closing, Shively had an approximate 1.6% ownership interest in Bancorp.

12. Steven Kalb ("Kalb") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. At the time of the Bank's closing, Kalb had an approximate 7.9% ownership interest in Bancorp.

13. Jerome Snyder ("Snyder") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010. At

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

the time of the Bank's closing, Snyder had an approximate 4.7% ownership interest in Bancorp.

14.   Hugh Templeton ("H. Templeton") was a director of the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010.  At the time of the Bank's closing, H. Templeton had an approximate 2.2% ownership interest in Bancorp.

15.   Rick Dreschler ("Dreschler") served as Executive Vice-President and Senior Lending Officer for the Bank from its inception in 1998 until the NDBI closed the Bank on May 28, 2010.  Dreschler also served on the Bank's Management Loan Committee.  At the time of the Bank's closing, through his family trust, Dreschler had an approximate 1.8% ownership interest in Bancorp.

16.   Collectively, Defendants owned or controlled 829,176 shares, or 59.3 percent, of Bancorp's stock.

### III.   JURISDICTION AND VENUE

17.   This Court has subject matter jurisdiction over this case pursuant to Title 12 of the United States Code sections 1819(b)(1) through (2) and 1821(d) through (k), as well as Title 28 of the United States Code sections 1331 and 1345.

18.   This Court has personal jurisdiction over the Defendants, who at all relevant times were residents of, and conducted the business of the Bank in, the State of Nevada.

19.   Venue is proper in this District under Title 28 of the United States Code section 1391(b) because a substantial portion of the events and/or omissions giving rise to the claims and damages asserted herein occurred in this District.

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

## IV.   BANKS' LENDING FUNCTIONS AND LOAN PORTFOLIOS

20.   Loan underwriting practices are the primary determinant of bank credit risk and bank credit availability and one of the most critical aspects of loan portfolio management.  Loan underwriting standards define a bank's desired level of creditworthiness for borrowers and guarantors and provide uniform criteria for evaluating loans.  Loan underwriting standards are also important in protecting bank capital, which can erode from imprudent, unsafe, or unsound lending practices.

21.   Underwriting practices (which are described in Parts 364 and 365 of the FDIC Rules and Regulations) are characterized by the criteria used to qualify borrowers, loan pricing, repayment terms, sources of repayment, and collateral requirements.  Underwriting practices also encompass the management and administration of the loan portfolio, including its growth, concentrations in specific markets, out-of-area lending, written lending policies, and adherence to written underwriting policies.

22.   Commercial real estate ("CRE") and acquisition, development, and construction ("ADC") loans are known to be more speculative than other types of loans because of, among other factors, the lack of a present cash flow source, uncertainties of development and sale, and the need for adequate secondary sources of repayment.  Prudent lending in this segment of banking requires sound underwriting, timely evaluation and response to economic trends affecting the industry, and strict adherence to prudent lending policies and standards.  Moreover, concentrating a loan portfolio in CRE/ADC loans increases market risk for numerous reasons, including, but not limited to: (a) concentration in any sector of the economy increases risk resulting from that sector's downturn; (b) the housing market, in particular, is cyclical in nature; (c) the primary

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422
MORRIS LAW GROUP

source of repayment is cash flow from the sale of the real estate collateral; and (d) historically, bank failure rates closely correlate with high CRE/ADC concentrations.  In short, a bank's directors and officers must vigilantly adhere to their bank's loan policies and prudent, safe, and sound lending practices when recommending or approving CRE or ADC loans because these loans are inherently riskier.

23.     Regulatory agencies periodically reminded financial institutions of the risks involved with CRE/ADC lending.  On October 8, 1998, the FDIC issued Financial Institution Letter 110-98, which cautioned financial institutions of the risks inherent with ADC lending even in a favorable real estate market, including an oversupply of developed property.  Among other things, the letter stated that "ADC lending is a highly specialized field with inherent risks that must be managed and controlled to ensure that this activity remains profitable."

24.     Similarly, on December 12, 1996, the Office of the Comptroller of the Currency, FDIC, and Board of Governors of the Federal Reserve System jointly issued a report entitled "Concentrations in Commercial Real Estate Lending, Sound Risk Management Practices," which specifically warned banks that "[c]oncentrations of credit exposure add a dimension of risk that compound the risks inherent in individual loans."

## V.     FACTUAL BACKGROUND

### A.     Brief Background of the Bank

25.     SWB was founded in July 1998 as a state-chartered bank with its headquarters in Las Vegas, Nevada.  As noted above, SWB was wholly owned by Sun West Capital Corporation ("Bancorp"), a single-bank holding company.  At the time of the Bank's closing, it had five branch

offices in the Las Vegas metropolitan area and two branch offices in Reno, Nevada.

26.     The Bank's primary line of business was making CRE and ADC loans in the state of Nevada.

27.     The Bank's Board of Directors ("BOD") consisted primarily of businesspersons that had been, or were, involved in commercial land development.  The BOD members had considerable banking and commercial development experience.

28.     Despite this experience, SWB's lending practices exhibited many weaknesses: poor loan underwriting; weak credit administration; an emphasis on asset growth without strong risk assessments; untimely loan downgrades; and late and inaccurate calculations of the Allowance for Loan and Lease Losses ("ALLL").

29.     In 2005, the BOD had established a 10-year plan of achieving a $1 billion threshold in assets.  The Defendants planned on accomplishing this goal, in part, by opening a new branch every year for 10 years.  They also aggressively extended credit primarily in the CRE and ADC area in an effort to quickly grow the assets of the Bank.

30.     In 2006, the Bank had total assets of over $413 million.

31.     In 2007, the Bank had total assets of over $421 million, with a net income of $7.5 million.

32.     In 2008, the Bank's assets had declined to $419.9 million and the Bank had a net income loss of $3.7 million.

33.     By 2009, the Bank's assets had further declined to $381.3 million.  That year the Bank had a net income loss of $32 million and over $130 million of "adversely classified" assets.

34.     Conditions continued to worsen at the Bank in 2009 and 2010.

35.    On May 28, 2010, the NDBI closed the Bank and appointed the FDIC as receiver.

**B.    Defendants Ignored Significant Warning Signs Of The Bank's Eventual Demise**

36.    For years prior to the Bank's eventual closure, the Defendants persisted in pursuing an aggressive growth strategy despite warnings from regulators, outside counsel, and even the Bank's Credit Administrative Officer ("CAO").

37.    The FDIC issued a Report of Examination ("RoE") as of June 30, 2006 to the Bank and noted that the condition of the Bank remained "fundamentally sound," but noted that there were "unfavorable trends."  Of particular note, the examiners identified that the Bank continued "to maintain a high concentration in loans secured by commercial real estate."  The examiners noted that loans secured by commercial real estate equaled 717 percent of Tier 1 Capital, an increase from 547 percent during the previous examination.  The examiners specified that the intent of these comments were "to remind management and the Board of the potential risk in concentrating a large percentage of loans in a particular type of collateral or for a particular purpose."

38.    Additionally, the examiners noted that while asset quality was satisfactory, "nearly all asset quality ratios reflect downward trends." The examiners also criticized management for placing growth objectives over capital maintenance objectives, resulting in an increase in classified loans, declining earnings performance, and the need for a significant unplanned increase in the ALLL.

39.    Additionally, the Defendants ignored the warnings given by the Bank's own outside counsel.  The Bank's legal counsel authored and published a national banking periodical which was provided to the BOD

every month.  As early as 2006, the Bank's outside counsel noted in his publication that construction was beginning to slow and housing prices were dropping in neighboring California.  It was also noted that national credit quality was declining and a number of banking institutions were encountering troubles based upon concentrations in CRE lending.

40.    In a report distributed to Directors at the March 21, 2007 Board of Directors meeting, an article entitled "Housing Slumps" noted that "[w]e have noticed some recent housing information that causes us some concerns, *primarily for banks that are heavily into construction lending*" (emphasis added) and that construction declines would likely continue to fall through 2007.

41.    In a RoE as of September 3, 2007, the examiners noted that while Defendants had taken some steps to address the weaknesses identified in the previous RoE, the "loan portfolio remain[ed] concentrated in [CRE] loans."  Additionally, the examiners noted that "management has yet to implement a formal stress testing program of the real estate portfolio to assist in monitoring risk levels within the portfolio under various economic conditions and to aid in formulating future lending policies regarding risk limits, underwriting criteria, and portfolio management." Defendants nevertheless continued to increase the exposure to CRE loans.

42.    The Defendants did not heed concerns expressed by the Bank's Chief Administrative Officer ("CAO").  The CAO tried unsuccessfully to convince the BOD that the regulators and their recommendations should be seen as a tool to assist Defendants in the performance of their duties.  He also criticized the then-existing lending practices, including the handling of certain risky loans.  In September 2008, the Bank terminated the CAO.  Defendant Delaney characterized the CAO's dismissal as a "reduction in force" for cost-cutting purposes even

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

though no other senior executive position was eliminated.  The Bank did not hire a replacement CAO.

43.   In the next RoE as of March 31, 2009, the FDIC triple-downgraded the Bank.  Examiners harshly criticized the BOD and management for "past risk taking, liberal underwriting practices, deficient loan oversight, and concentrations in [CRE loans]," specifically identifying: (1) speculative lending for which the borrower did not contribute cash and lacked the financial wherewithal to independently repay the loan; (2) lending to purchase land with no defined development or repayment plans; and (3) reliance on the value of collateral "as-built" rather than "as-is" values to extend or renew problem credits without defined repayment plans.  The Bank's financial condition was unsatisfactory, and examiners questioned its future viability based on poor asset quality that was rapidly deteriorating.

44.   The examiners found that adversely classified assets totaled $130 million and represented 263 percent of Tier 1 Capital.  CRE loans represented 93 percent of adversely classified items.  Examiners criticized the BOD and management for failing to identify problems and risks in the loan portfolio, failing to properly monitor loan performance, and failing to implement adequate internal controls.  Examiners stated that "[u]ndue risk taking, inconsistent underwriting and credit administration practices, coupled with a rapidly deteriorating local economy, have crippled the bank."

45.   As of a December 31, 2009 joint NDBI-FDIC visitation, the Bank's overall condition had further deteriorated.  The BOD and management were deemed responsible for the undue risks, the excessive CRE concentration, and the poor condition of the Bank.  The Bank was found to be "significantly undercapitalized."

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

### C.   The Bank's Loan Policy and Approval Process

46.   The July 2006 Loan Policy ("Loan Policy") established guidelines and requirements for commercial loans, including loan documentation, underwriting procedures, loan-to-value ("LTV") ratios, and characteristics of desirable and undesirable loans.  The Loan Policy set out the guiding principle that the "loans should be considered for constructive economic purposes which are consistent with sound bank lending practices."

47.   "Undesirable loans" under the policy included "[l]oans to individuals with little or no capital invested in the venture," loans for "payroll and payroll taxes," and debt consolidation loans to businesses. Loans to one borrower were limited to $8.5 million.

48.   Acceptable LTV ratios differed with the type of loan under consideration.  Loans to acquire land and loans secured by real estate could not exceed a 50 percent LTV ratio based on the value in the appraisal or the cost, whichever was less, and required that borrowers contribute at least 40 percent equity to the project.  For commercial or residential development, the Loan Policy required a 65 percent LTV ratio.

49.   The Loan Policy also had specific requirements for construction loans.  Borrowers had to demonstrate "verifiable cash flow" to retire debt or to obtain qualified take-out financing.  Construction loan borrowers also had to have a minimum of 25 percent cash invested for owner-occupied commercial projects, 30 percent for non-owner occupied commercial projects and 35 percent for lot development loans.

50.   The Loan Policy required that loans for more than $1 million for unsecured, commercial and equipment loans—and above $1.5 million for real estate loans— be approved by the BOD.

51.     The Management Loan Committee ("MLC") was made up at all times of at least three officers and/or directors.  Delaney chaired the MLC from September 1998 until the Bank failed.  Dreschler served as Vice-Chairman of the MLC from October 1998 until the Bank failed.  Shively served as a member of the MLC from March 1999 until the Bank closed. The lending limits for the MLC were relatively low:  $1 million for unsecured, commercial and equipment loans, and $1.5 million for real estate loans.

52.     Following preliminary approval by the MLC, potential loans in excess of these amounts had to be approved by members of the BOD, who reviewed Loan Credit Reports ("LCRs"), and voted to approve or deny the credits.

**D.     Loan Underwriting Violations and Deficiencies**

53.     Between June 12, 2007, and May 28, 2010, the Defendants approved loans in violation of the Loan Policy and prudent, safe, and sound underwriting standards by some or all of the following acts or omissions, among others:

a.     Speculative Lending – Approving speculative, high-risk loans after the economic decline of the real estate market was well known;

b.     Loans to Non-Creditworthy Borrowers – Approving loans to borrowers who were uncreditworthy and/or in financial difficulty;

c.     Loans to Non-Creditworthy Limited Liability Companies – Approving loans to limited liability companies with no operating histories or revenues and no assets other than the collateral for the loan;

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

d.    Excessive LTV Ratios – Approving loans with excessive LTV ratios;

e.    Overreliance on Interest Reserves – Approving loans that placed a risky overreliance on the use of interest reserves;

f.    Loans to Borrowers With Improper Equity Investments – Approving loans to borrowers with little or no equity invested in the financed projects;

g.    Inadequate Financial Analysis – Approving loans without conducting adequate analysis of borrower or guarantor global cash flows.

h.    Improper Renewals or Extensions – Approving renewals or extensions of loans when it was clear at the time that the borrower would not be able to meet their financial obligations to the Bank.

54.    Defendants are liable for the damages that they caused. In this lawsuit, FDIC-R seeks to collect damages flowing from the Defendants' gross negligence and/or breaches of fiduciary duty.  The transactions set forth below illustrate the types of failures, breaches, and violations of duty referenced above committed by each of the Defendants, resulting in damages.  The FDIC-R seeks compensatory damages and other relief as a result of Defendants' conduct as described below.

1.    **TP 5, LLC**

55.    Defendants Delaney, K. Templeton, H. Templeton, Carter, Shively, Snyder, Stout, Kalb, and Dreschler approved two loans to TP 5, LLC ("TP5") for the construction of single-family residences.  The first loan refinanced a land loan through another bank for the infrastructure work for the construction of six single-family homes and was funded on November

20, 2007.  The second loan was to fund construction of a luxury home on one of the six lots.  The second loan was made on March 14, 2008, prior to any vertical construction on the lots.  The two loans totaled $3.55 million.

56.    These transactions represented a further concentration in CRE for the Bank, despite repeated warnings regarding the risk factors associated with the Bank's already existing over concentration in CRE lending.

57.    This risk was exacerbated by the fact that information considered by Defendants at the time they approved the transactions showed that the borrowers' wealth and future earnings were almost entirely tied to the CRE market.  Thus, if the CRE market were to deteriorate, which it already was beginning to do by late 2007, not only would the value of the collateral decline, but the borrowers' ability to repay the loan from outside sources of income would be impaired.

58.    Additionally, the repayment schedule Defendants approved for the TP5 loans was materially deficient, in violation of the Bank's own written policies.  The primary repayment schedule for both loans was through the use of interest reserves, which came through loan advances.

59.    Furthermore, internal Bank communications indicate that the Defendants were aware at the time they approved the transactions that the "primary income driver" of the borrower was an entity owned by certain of the guarantors, Framecon.  Despite recognizing that this entity was the best source for alternative repayment, Defendants did not require Framecon to provide financial guarantees for the transactions.

60.    Information considered by the Defendants at the time they approved the loans also showed that TP5 itself was an entity formed just two years prior to approval of the first loan in November 2007.  It had

no assets other than the lots to be developed, and a negative net worth of ($216,205).  The LTV ratio for the first loan was 75 percent, in excess of the Bank's 65 percent limit.  TP5 contributed no equity to the project, even though the Bank's loan policy required borrowers to have at least 35 percent equity in lot development projects.  Four of the five guarantors had negative cash flow, and the fifth had earned only $116,000 per year.

61.   Additionally, numerous extensions were given to the borrower in violation of loan policies.  Despite the Loan Policy requiring a majority vote of the MLC, most of the extensions were granted with the approval of only one MLC member—Dreschler.

62.   Both loans subsequently went into default.

63.   As a result of these deficiencies, Defendants caused losses of at least $1,977,623.26.

**2.    1691 Tangiers LLP**

64.   Defendants Delaney, K. Templeton, Carter, Snyder, Stout, Kalb, and Dreschler approved a $1.6 million loan to 1691 Tangiers LLP ("Tangiers") for the purchase of a partially completed single-family residence from a bankruptcy trustee and to fund completion of the construction.  It was originated on November 5, 2007.

65.   The Tangiers transaction also represented a further concentration in CRE lending.

66.   The nature of this transaction also should have represented a warning to Defendants of the deteriorating real estate market and the risks associated with continued CRE lending as the property was being purchased through the bankruptcy of another home developer.

67.   Defendants approved this loan in violation of the Bank's policies for construction loans.  The policies required that construction

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

loans have an identified source of repayment—which included either a qualified take-out loan or verifiable cash flow to retire the debt.

68.    The loan file for the Tangiers loan indicates that the primary source of repayment was to be take-out financing from another lender; though no evidence of a "qualified take-out" commitment existed.

69.    Additionally, Defendants approved the loan despite the fact that the borrower, Tangier, was formed solely for the purchase of the property, had no revenues and no operating history, and had no ability to retire the debt other than with a sale of the property.  Financial information provided by the guarantor at the time Defendants approved the transaction demonstrated that the guarantor lacked the wherewithal to retire the debt through its then existing cash flow.  This led to payments coming primarily from interest reserves, available through advances, for the first 22 months of the loan—ending only when the interest reserves were exhausted.

70.    Defendants also failed to properly supervise the use of the proceeds provided to Tangiers.  Despite an original plan to complete construction within 18 months, Defendants allowed the borrower to delay construction which impacted the value of the collateral as the real estate market continued to decline.

71.    Additionally, numerous extensions—seven in total—were given to the borrower in violation of the Bank's loan policies.  Despite the Loan Policy requiring a majority vote of the MLC, most of the extensions were granted with the approval of only one or two MLC members— Dreschler and/or Delaney.

72.    The Tangiers loan subsequently defaulted.

73.    As a result of these deficiencies, Defendants caused losses of at least $498,000.00.

### 3.   Palisades Estate Development, LLC

74.   Defendants Delaney, H. Templeton, K. Templeton, Carter, Snyder, Stout, Kalb, and Dreschler approved a $980,000 loan to the Palisades Estate Development, LLC ("Palisades") for the purpose of construction of a single-family residence.  The loan was funded on September 7, 2007.

75.   The Palisades loan represented a further concentration in CRE lending after repeated warnings from regulators regarding the Bank's already existing over concentration in CRE.

76.   Defendants approved this loan in violation of SWB's Loan Policy because it was a speculative construction loan without any verified source of repayment other than the sale of the unit upon completion of construction.

77.   Financial information considered by Defendants in connection with their approval of this transaction showed that all of Palisades' assets and cash flow were directly tied to the already deteriorating real estate market.  There is no indication that the Defendants performed a global cash flow analysis of either Palisades or the loan guarantors or assessed the ability of Palisades or the guarantors to service the debt.  At the time Defendants approved this loan, information available to them showed that the two limited liability companies that owned Palisades had negative net worths of ($127,000) and ($10,987), respectively.

78.   The interest payments made on the Palisades loan came primarily from interest reserves funded through loan advances.  When those interest reserves were exhausted, rather than declaring a default of the loan, Defendants chose to take additional unused loan funds and use them as a second interest reserve.  Because the Loan Policy required that borrowers maintain an interest reserve of "a minimum of 50% or more of

the interest on the full principal amount of the loan," this action violated the Bank's procedures.  In September 2009, the Bank amended the Loan Policy to specifically prohibit that practice.

79.     Additionally, numerous extensions were given to the borrower in violation of the Bank's loan policies.  Despite the Loan Policy requiring a majority vote of the MLC, most of the extensions were granted with the approval of only one MLC member—Dreschler.

80.     The Palisades loan subsequently defaulted.

81.     As a result of these deficiencies, Defendants caused losses of at least $152,013.06.

**4.     Bully's Sports Bar and Grill**

82.     Defendants Delaney, H. Templeton, K. Templeton, Carter, Snyder, Kalb, Shively, and Dreschler approved a $1.844 million loan to Bully's Sports Bar and Grill ("Bully's") on March 21, 2008, which violated a number of provisions of the Bank's Loan Policy.  The origination date for the transaction was March 21, 2008, though additional credit was extended to Bully's on several subsequent dates, increasing the size of the transaction.

83.     The Loan Policy identified "[d]ebt consolidation loans to business borrowers" as an "undesirable" loan purpose.  Additionally, "[l]oans for payroll or payroll taxes" were identified as an additional "undesirable" loan purpose.

84.     On three separate occasions in February 2009, Defendants extended a total of $400,000 to Bully's through this loan relationship ostensibly for "working capital," but the proceeds were deposited directly into Bully's *payroll* account held at the Bank.

85.     Additionally, the owner of Bully's had been experiencing significant cash flow problems, including negative cash flow for at least

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

three years.  By extending credit to Bully's with that knowledge, Defendants violated the Loan Policy and prudent lending standards.

86.     Furthermore, during the course of the relationship, Defendant Shively chose to unilaterally waive over $500,000 worth of overdraft fees to keep Bully's afloat.  This was in direct violation of the Loan Policy which stated that overdrafts were not to be used as extensions of credit without first obtaining "approval within established credit authorities," which was not done.

87.     The Bully's loan subsequently defaulted.

88.     As a result of these deficiencies, Defendants caused losses of at least $914,869.63.

**5.     Cross Creek Development, LLC**

89.     Defendants Delaney, H. Templeton, K. Templeton, Carter, Snyder, Kalb, Stout, and Dreschler approved a $9 million loan to Cross Creek Development, LLC ("Cross Creek") for the development of a master-planned park of industrial lots.  The transaction was originated on June 12, 2007, and was done in participation with East West Bank ("EWB").

90.     Despite EWB acting as the lead bank, SWB's participation interest was 50.3%.  The total size of the transaction was $17 million.

91.     This loan represented further concentration in CRE despite repeated warnings by regulators of the risk associated with the Bank's already existing over concentration in this area.

92.     Defendants approved the Cross Creek transaction despite the fact that it exceeded the Bank's loan limit of $8.5 million.

93.     The loan also exceeded the LTV ratio set by the Loan Policy.  The approved LTV for the Cross Creek transaction was 70 percent at origination, dividing the total size of the $17 million loan by the projected appraised value of finished industrial lots of $24 million.  The

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

Bank's Loan Policy set a limit of 65 percent for this type of loan.  In addition, the appraisal available to the Defendants at the time they approved the transaction stated that the projected value of the finished industrial lots was based on minimal market data in the planned project area, and that the market for a large master-planned industrial park in the area was unproven.  The as-is appraised value of the unfinished lots at the time Defendants approved the loan was $14 million, significantly less than the total size of the $17 million loan.

94.    Defendants approved the Cross Creek loan in violation of the Loan Policy as it was a speculative construction loan without a verified source of repayment aside from the sale of the collateral.  The borrower, Cross Creek, did not have the cash flow available to service the debt.  Financial statements from the guarantor available to the Defendants at the time they approved the loan showed that the guarantor did not have sufficient cash flow to service the debt over the 18-month term of the loan.

95.    Finally, Defendants allowed EWB to retain sole discretion with relation to foreclosure and sale of the collateral.  While it is not unusual for a lead bank in a participation loan to have this power, it was grossly negligent for Defendants to allow EWB to retain that discretion in light of SWB providing over 50% of the funds.

96.    None of 39 proposed industrial lots sold during the 18-month period of the loan.

97.    After the loan defaulted, Defendant Delaney noted in an email correspondence that she "was disappointed that [the BOD] let a participation agreement get through like that. . . .  We should always have some say, especially on a 50/50 split."

98.    As a result of these deficiencies, Defendants caused losses of at least $3,378,905.05.

### 6. TLC Casino Enterprises, Inc.

99.    Defendants Delaney, K. Templeton, Snyder, Kalb, Stout, and Dreschler approved on March 7, 2008 a $4.25 million loan to TLC Casino Enterprises, Inc. ("TLC") for the purpose of acquiring and renovating Binion's Gambling Hall & Hotel ("Binion's"), a casino property in Las Vegas, Nevada, and refinancing existing debt that the borrower had with another bank.

100.    The TLC transaction was a participation with Nevada State Bank ("State") operating as the lead bank, with SWB and two other banks also having participation interests.  The total loan was for $57 million with SWB's $4.25 million loan representing 7.46 percent of the project.

101.    The TLC loan is yet another example of the Defendants' disregard for regulators' warnings regarding the Bank's already existing over concentration in CRE.  Additionally, the loan violated a number of the Bank's lending policies.

102.    First, SWB's Loan Policy required that all loans have an identifiable source of repayment.

103.    In the offering memorandum for the TLC loans, it was stated with regard to the primary source of repayment: "[h]istorical cash flow is insufficient to cover 100% of the proposed debt requirement, due to drain on cash flows at Binion's property, so there is a reliance on the borrower's [revenue] projections [for the property after renovations were complete]."

104.    There is no indication that the Defendants did any research or due diligence to determine whether the borrower's projections were reasonable.  In fact, this type of transaction was beyond the expertise of Defendants, who relied heavily on the lead bank's transaction analysis. For example, the stated LTV ratio was 38 percent, but ballooned to 106

percent just two years later.  In addition, defendants approved this transaction on March 7, 2008, well into the throes of the real estate market decline, and in an area of Las Vegas where demand already was diminished.  In addition, there is no indication that Defendants requested financial statements or tax returns from the guarantors of the TLC loan to assess their ability to serve as a secondary source of repayment.

105.   Second, the Loan Policy identified transactions where the borrower has no cash invested as being "undesirable."

106.   With the TLC loan, not only did TLC not have cash invested in the acquisition of Binion's, the loan actually resulted in cash out to the borrower at closing.

107.   Third, Defendants failed to properly monitor the use of the loan funds.

108.   A primary purpose of the loan was the renovation of Binion's.  A total of $10 million of the loan funds were in fact earmarked for this purpose.  This was of particular importance since the appraisals and revenue projections used by the banks were based on the estimated value of Binion's upon completion of the renovations.

109.   The lead bank, however, did not require a construction voucher control process or include any other provisions for monitoring the usage of the loan funds.

110.   In the end, rather than fully renovating Binion's, TLC closed the hotel portion of the property and used those funds instead for working capital.  This severely impaired the value of the loan collateral.

111.   The TLC loan was not repaid.

112.   As a result of these deficiencies, the Bank suffered losses of at least $1,233,967.05.

# VI.    CLAIMS FOR RELIEF

## COUNT I

## GROSS NEGLIGENCE – VIOLATION OF 12 U.S.C. § 1821(k)

113.    FDIC-R re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 112 above as if fully set out here.

114.    Pursuant to Section 1821(k) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), and without impairing or affecting any right of the FDIC under any other law, directors and officers of failed financial institutions may be held personally liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law.  12 U.S.C. § 1821(k).

115.    Under Nevada law,

"Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a prudent man" and the difference between ordinary negligence and gross negligence is that they "differ in the degree of intention."

*Federal Deposit Insurance Corporation v. Johnson*, No. 2:12-CV-00209-KJD-PAL, 2012 WL 5818259, *6 (D. Nev. Nov. 15, 2012) (quoting *Hart v. Kline*, 61 Nev. 96, 100-101, 116 P.2d 672, 674 (1941)).

116.    Defendant Delaney was an officer and director of the Bank.

117.    Defendants Carter, Kalb, Snyder, Stout, H. Templeton, and K. Templeton were directors of the Bank.

118.    Defendants Dreschler and Shively were officers of the Bank.

119.    As directors and/or officers of the Bank, and/or members of the Bank's Loan Committees, the Defendants were required to conduct

MORRIS LAW GROUP • 900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101 • 702/474-9400 • FAX 702/474-9422

the Bank's business consistent with prudent, safe, and sound lending practices. More specifically, they owed the Bank duties including, but not limited to, the following:

      a.    Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

      b.    Approving only those transactions that conformed to the Bank's lending policies;

      c.    Approving only those loans that conformed to prudent, safe, and sound lending practices;

      d.    Ensuring that the transactions that they approved were soundly underwritten;

      e.    Ensuring that loans they approved were secured by collateral and guarantees of sufficient value to prevent or minimize the risk of loss; and

      f.    Ensuring that loans were administered in accordance with approved loan terms and lending policies.

    120.    Defendants breached their duties by approving one or more of the loans identified above in Paragraphs 55 through 112, because they knew, or should have known, that:

      a.    The loans were not properly underwritten and/or were inconsistent with prudent lending practices;

      b.    The loans, and/or the projects underlying the loans, were not properly monitored, and the loans did not comply with approved loan terms;

      c.    The Nevada-area real estate market, where the collateral was located, was in decline;

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

MORRIS LAW GROUP · 900 BANK OF AMERICA PLAZA · 300 SOUTH FOURTH STREET · LAS VEGAS, NEVADA 89101
702/474-9400 · FAX 702/474-9422

    d.    The Bank was already over-exposed to CRE risk;

    e.    Each of the loans involved one or more of the following characteristics, which increased the risks of default:

        i.    Violations of the Bank's Loan Policy;

        ii.    Inadequate and/or speculative sources of repayment;

        iii.    Over-reliance on interest reserves;

        iv.    Borrowers and/or guarantors with insufficient assets or income to service their loan or provide a source of repayment in the event of default;

        v.    Excessive LTV ratios; and

        vi.    Borrowers with little to no equity invested in the financed projects.

121.   As a direct and proximate result of the Defendants' gross negligence and failure to conduct the Bank's business consistent with prudent, safe, and sound lending practices, FDIC-R suffered damages in excess of $8 million, which damages will be more particularly determined at trial.

## COUNT II

## BREACH OF FIDUCIARY DUTY – NEVADA LAW

122.   FDIC-R re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 121 above as if fully set out here.

123.   Defendant Delaney was an officer and director of the Bank.

124. Defendants Carter, Kalb, Snyder, Stout, H. Templeton, and K. Templeton were directors of the Bank.

125. Defendants Dreschler and Shively were officers of the Bank.

126. Defendants, as officers and/or directors of the Bank, owed the Bank fiduciary duties to act on an informed basis in the best interests of the Bank. These duties included, but were not limited to, the following:

      a.    Informing themselves about proposed loans and the risks the loans posed to the Bank before approving them;

      b.    Approving only those transactions that conformed to the Bank's lending policies;

      c.    Approving only those transactions that conformed to prudent, safe, and sound lending practices;

      d.    Ensuring that loans they approved were soundly underwritten;

      e.    Ensuring that loans they approved were secured by collateral and guarantees of sufficient value to prevent or minimize the risk of loss; and

      f.    Ensuring that loans were administered in accordance with approved terms and lending policies.

127. Defendants breached their duties by approving one or more of the loans identified above in Paragraphs 55 through 112, because they knew, or should have known, that:

      a.    The loans were not properly underwritten and/or were inconsistent with prudent lending practices;

MORRIS LAW GROUP
900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101
702/474-9400 • FAX 702/474-9422

b.   The loans, and/or the projects underlying the loans, were not properly monitored, and the loans did not comply with approved loan terms;

c.   The Nevada-area real estate market, where the collateral securing the loans was located, was in decline;

d.   The Bank was already over-exposed to CRE risk;

e.   Each of the loans involved one or more of the following characteristics, which increased the risks of default:

i.   Violations of the Bank's Loan Policy;

ii.   Inadequate and/or speculative sources of repayment;

iii.   Over-reliance on interest reserves;

iv.   Borrowers and/or guarantors with insufficient assets or income to service their loan or provide a source of repayment in the event of default;

v.   Excessive LTV ratios; and

vi.   Borrowers with little to no equity invested in the financed projects.

128.   As a direct and proximate result of the Defendants' breach of their fiduciary duties and failure to conduct the Bank's business consistent with prudent, safe, and sound lending practices, FDIC-R suffered damages in excess of $8 million, which damages will be more particularly determined at trial.

**JURY DEMAND**

129.   FDIC-R requests a trial by jury on all issues so triable.

MORRIS LAW GROUP

900 BANK OF AMERICA PLAZA • 300 SOUTH FOURTH STREET • LAS VEGAS, NEVADA 89101

702/474-9400 • FAX 702/474-9422

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Sun West Bank, requests judgment in its favor against the Defendants as follows:

A.     For compensatory damages and other damages, jointly and severally, against Defendants for their gross negligence and/or breaches of their fiduciary duty that resulted in damages;

B.     For prejudgment and other appropriate interest pursuant to Title 12 of the United States Code section 1821(1) and Nevada law;

C.     For costs and other expenses incurred in connection with this proceeding that are recoverable under Nevada law; and

D.     For such other and further relief as that Court deems just and proper.

MORRIS LAW GROUP


By____/s/ Joni A. Jamison_____
    Robert McCoy, No. 9121
    Joni A. Jamison, No. 11614
    900 Bank of America Plaza
    300 South Fourth Street
    Las Vegas, Nevada  89101

LEE, HONG, DEGERMAN, KANG
& WAIMEY
Eric D. Olson (*pro hac vice* )
Keith H. Fichtelman (*pro hac vice*)
1920 Main Street, Suite 900
Irvine, California  92614

Attorneys for Plaintiff Federal Deposit
Insurance Corporation as Receiver for
Sun West Bank